USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/2/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | 10 Cr. 516 (SHS) |
| -against- | OPINION |
| JOHN RAYMOND ANTHONY WHITE, | |
| Defendant. | |

SIDNEY H. STEIN, U.S. District Judge.

Following a five-day jury trial, defendant John White was convicted on April 20, 2011 of mail fraud in violation of 18 U.S.C. § 1341; three counts of major fraud against the United States in violation of 18 U.S.C. § 1031; making a false statement to a federal law enforcement officer in violation of 18 U.S.C. § 1001(a); and witness tampering in violation of 18 U.S.C. § 1512(b)(3). During the sentencing phase, a dispute arose over the proper method of calculating loss pursuant to section 2B1.1 of the Sentencing Guidelines and Application Note 3(F)(ii) to that section, which addresses loss in connection with the receipt of government benefits. For the reasons set forth below, this Court concludes that where a defendant fraudulently receives a government contract that has been set aside for a targeted group and subsequently renders services to the government pursuant to that contract, the loss is the value of the benefit the defendant obtains—in this case, the actual or intended profit under the contract—not the full face value of the contract.[1]

---

[1] On August 29, 2012, the Court heard oral argument on the method of calculating loss and set forth its conclusions on this issue, which are set forth in this Opinion. Subsequent to that conference, the government stated its intention not to contest the Court's interpretation and not to seek a Fatico hearing on the amount of White's profit, if any. (See Sept. 4, 2012 Ltr. from AUSA Alvin L. Bragg, Jr., Dkt. No. 78, at 1.) At White's sentencing on September 19, 2012, the Court decided several additional

I. BACKGROUND

A. Factual Background

White's fraud was as simple as it was brazen. Between 2007 and 2009, White's wholly owned company, Mitsubishi Construction Corporation ("MCC"),[2] bid on and received four construction contracts awarded by the U.S. Department of Veterans Affairs ("VA") for construction work to be performed at VA and Army facilities in Manhattan; Baltimore; Montrose, New York; and Coatesville, Pennsylvania. These contracts had been set aside to be awarded to either small businesses owned by veterans or small businesses owned by service-disabled veterans. On numerous occasions, White represented to the VA and the Army that MCC was eligible to be awarded these construction contracts. He also represented that he had served in a college ROTC program and in the Special Forces. Those representations were false.

MCC nonetheless won the four contracts, which had a total face value of approximately $16.7 million. Although White procured the four contracts through fraud, it is not disputed that White and MCC actually performed at least part of the work MCC contracted to do. The VA paid MCC more than $4.9 million on the four construction contracts before White's fraud was uncovered and the contracts terminated.[3]

In the course of the VA's investigation into the fraud, White made a false statement to an investigator from the VA by telling him that one of MCC's employees, an actual veteran, was in fact the majority owner of MCC. One week after the indictment was unsealed, White compounded his wrongdoing by offering another MCC employee $5,000 to testify

---

sentencing issues on the record, including White's criminal history calculation, variance determinations, restitution, and the proper grouping analysis under the Guidelines. This Opinion addresses only the loss calculation due to the likelihood of this issue arising in other sentencing proceedings involving set-aside contracts.

[2]   MCC has no connection to the Japanese conglomerate Mitsubishi Group.

[3]   White claims the government owes him hundreds of thousands of dollars for uncompensated work performed by MCC.

falsely as to the structure of MCC. Based on the extensive evidence presented at trial, the jury found White guilty on all counts.

### B. Sentencing

The offense level for major fraud against the United States—Counts 2, 3, and 4 of the indictment—is determined largely on the basis of the total amount of the "loss," as governed by U.S.S.G. § 2B1.1. This section, as relevant to White, sets a base offense level of 7 due to his conviction for fraud. *See* U.S.S.G. § 2B1.1(a)(1). The government and the U.S. Probation Office took the position that the "loss" to the victim in this case was $16.7 million—the face value of the four contracts that White fraudulently obtained. This $16.7 million "loss" figure resulted in a 20-level increase in White's offense level and substantially increased his Guidelines sentence range. *See* U.S.S.G. § 2B1.1(b)(1)(K).

Defendant objected to the government's loss calculation on the grounds that it did not take into account the value of the significant services White provided to the government, i.e., the value of the construction services MCC rendered to the government—in this case, physical improvements to VA and Army facilities. The government responded that White was not entitled to any credit for those services because the loss calculation is governed by Application Note 3(F)(ii) to U.S.S.G. § 2B1.1, which states in its entirety:

> Government Benefits.—In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1, application note 3(F)(ii). The parties agree the contracts at issue are "government benefits." The government argued that the application note, read literally, provides that the loss is "not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses"—i.e., the $16.7 million in contracts obtained by MCC, with no provision for any offsets for labor, materials, or any other cost to

3

MCC. Because White was not eligible to be awarded any of the four contracts since he was neither a veteran nor a service-disabled veteran, the government contended that the entire amount of the contracts—$16.7 million—should be considered the intended loss for Guidelines purposes.

## II. DISCUSSION

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), courts have the discretion to impose a sentence outside of the range set by the Sentencing Guidelines. However, a district court still "must 'begin all sentencing proceedings by correctly calculating the applicable Guidelines range'" to ensure that its sentence is procedurally reasonable. *United States v. Skys*, 637 F.3d 146, 152 (2d Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Failure to calculate the Guidelines range or erring in that calculation constitutes procedural error. *See United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010). Courts employ the traditional tools of statutory interpretation to construe the Guidelines, starting with the plain language, *see United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 969 (2011), and commentary, which is authoritative unless it violates the Constitution or a federal statute. *See United States v. Walker*, 595 F.3d 441, 445 (2d Cir. 2010). To interpret amendments to the Guidelines or its application notes, courts may also rely on the Sentencing Commission's reasons for making the amendments. *Cf. United States v. Rivera*, 662 F.3d 166, 183 & n.16 (2d Cir. 2011) (relying in part on Commission's "Reason for Amendment" to interpret U.S.S.G. § 1B1.10).

### A. The Four Contracts at Issue Are "Government Benefits"

Application Note 3(F)(ii) does not define "government benefits," but it does provide a list of examples that qualify as government benefits, as follows: "In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments) . . . ." U.S.S.G. § 2B1.1, application note 3(F)(ii). It also adds food stamps as an example of a government benefit. *See id.* Four U.S. Courts of Appeals have concluded that government contracts that are set aside for disadvantaged or minority-owned businesses fall within the Guidelines' definition of "government benefits." *See United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009); *United*

*States v. Tulio*, 263 F. App'x 258, 260, 263–64 (3d Cir. 2008); *United States v. Leahy*, 464 F.3d 773, 790 (7th Cir. 2006); *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 317–18 (4th Cir. 2000). The Second Circuit has not had occasion to rule on this issue.

The list in Application Note 3(F)(ii) strongly suggests that "government benefits" should include any form of assistance that the government intends to go to a targeted group. The VA contracts set aside for small businesses owned by veterans and service-disabled veterans fall squarely within the definition of government benefits in Application Note 3(F)(ii). Just as the state program in *Tulio*, which required construction subcontracts to go to minority- or women-owned businesses, the VA's set-aside program is an "effort to increase the opportunities" for a class of businesses specified by Congress. *Tulio*, 263 F. App'x at 260; *see* Pub. L. No. 109-461, § 502(a)(1), 120 Stat. 3403, 3431 (codified at 38 U.S.C. § 8127(a)(1)) (ordering the VA to set goals for such contracts "[i]n order to increase contracting opportunities for small business concerns owned and controlled" by such veterans). The VA was more "concerned with *who* is doing the work not necessarily how much it costs . . . ." *United States v. Campbell*, No. 1:CR-08-007, 2010 WL 2650541, at *3 (M.D. Pa. July 1, 2010). Therefore, the Court concludes that Application Note 3(F)(ii) will guide this Court's loss calculation for White's fraud.

### B. The Loss Is the Amount of White's Actual or Intended Profits, Not the Face Value of the Contracts

As noted above, this Court reaches a different conclusion than the government concerning how to value the loss caused by White's fraud. The Application Note gives two alternative methods for calculating loss in cases involving government benefits: "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients *or* diverted to unintended uses, as the case may be." U.S.S.G. § 2B1.1, application note 3(F)(ii) (emphasis added).

### 1. *White Did Not Divert Benefits from Unintended Uses, But He Was an Unintended Recipient*

The Court can disregard the "diverted to unintended uses" test. This measure applies to benefits legitimately received but illegitimately spent—for example, food stamps used for the impermissible purpose of purchasing beer or cigarettes. *See United States v. Caba*, 911 F. Supp. 630, 639 (E.D.N.Y.), *aff'd*, 104 F.3d 354 (2d Cir. 1996); *see also United States v. Peters*, 59 F.3d 732, 733–34 (8th Cir. 1995) (concluding that only the portion of government benefits used for unapproved renovation projects constituted losses). The government does not contend that White failed to perform under the contracts or used funds he and MCC received for unapproved projects; it argues that White never should have received the contracts in the first place. Thus, this is a case where an "unintended recipient," i.e., someone not a veteran or service-disabled veteran, obtained benefits, namely, the construction contracts. Application Note 3(F)(ii) specifies that the proper measure of loss is "not less than the value of the benefits obtained by [the] unintended recipient[]."

### 2. *What Is the "Value of the Benefits Obtained"?*

To interpret the phrase "value of the benefits obtained," this Court begins with the ordinary meaning of those terms. Non-legal dictionaries define "benefit" to mean a "[p]ecuniary advantage, profit, gain," Oxford English Dictionary (3d ed.), or a "payment, [or] gift." Webster's Third New Int'l Dictionary 204 (1993). *Black's Law Dictionary* defines "benefit" as "[p]rofit or gain; [especially], the consideration that moves to the promisee . . . ." Black's Law Dictionary 178 (9th ed. 2009). Based on the ordinary meaning of this term, therefore, this Court concludes that the *profits* White actually obtained or intended to obtain is the correct measure of loss pursuant to Guidelines section 2B1.1.

The history of Application Note 3(F)(ii) supports this conclusion. Prior to November 1, 2001, section 2F1.1, rather than section 2B1.1, provided the base offense level for fraudulent diversion of government benefits. Application Note 8(d) to section 2F1.1 provided that "[i]n a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1,

application note 8(d) (2000 ed.), *available at* http://www.ussc.gov/ Guidelines/2000_guidelines/Manual/CHAP2-3.pdf. The Sentencing Commission struck this section and merged it into section 2B1.1 as part of a major six-part amendment, effective November 1, 2001, that resulted from a "Commission study of economic crime issues over a number of years." U.S.S.G., app. C, vol. II, Amendment 617, at 172 (2011). As part of a general revision and consolidation of economic crimes effectuated by that amendment, the text of the former Application Note 8(d) to section 2F1.1 was deleted and replaced in its entirety with the current Application Note, whose text has since remained unchanged. *See id.* at 141 (deleting old language); U.S.S.G. 2B1.1, application note 2(F)(ii) (2001 ed.) (including new language), *available at* http://www.ussc.gov/Guidelines/2001_ guidelines/Manual/CHAP2-1.pdf. Importantly, the new Application Note added "the value of the benefits obtained" as an alternative means of calculating loss. The Commission made pellucidly clear that this Note adopted a "***net loss approach*** [that] is more consistent with general rules for determining loss." U.S.S.G., app. C, vol. II, Amendment 617, at 181 (2011) (emphasis added). Both text and legislative history thus lead to the conclusion that White's actual or intended profits is the correct value of the benefits White obtained on the contracts.

    This Court is not alone in reaching the conclusion that White's actual or intended profit—not the $16.7 million face value of the contracts—is the true measure of loss for fraudulently obtained set-aside contracts. In *United States v. Loscalzo*, 18 F.3d 374 (7th Cir. 1994), the Seventh Circuit addressed this issue in the context of a sale-of-goods contract intended for minority-owned businesses. *See id.* at 378–79, 386. In *Loscalzo*, the government agency that awarded the contract "paid a premium price . . . for the purpose of furthering the policy of increased minority entrepreneurship." *Id.* at 386. The defendants fraudulently obtained the contract and thus deprived the government of some, but not all, of the "contracted-for consideration, namely, performance by a minority operation." *Id.* The court did not hold that the loss was the full face value of the contract—rather, the damages could be measured by the difference between a "true minority bid" and the defendant's. *Id.* This measure punishes a defendant based on the benefit he obtained that the

7

government intended to go into the pocket of a minority-owned business, or in White's case, a veteran-owned or service-disabled, veteran-owned small business.

The government relied on *United States v. Brown*, 151 F.3d 476 (6th Cir. 1998), and *United States v. Nastasi*, No. 00 Cr. 809, 2002 WL 1267995 (E.D.N.Y. Apr. 17, 2002), in support of its argument that the applicable loss was the face value of the four contracts. (*See* U.S. Sentencing Mem., Dkt. No 64, at 10–11.) Neither of these cases supports this conclusion. As an initial matter, both courts relied on the now-superseded version of the Guidelines. *See Brown*, 151 F.3d at 489; *Nastasi*, 2002 WL 1267995, at \*5; *see also Leahy*, 464 F.3d at 790 (relying on former Application Note to hold that loss was the face value of the contract); *Bros. Constr.*, 219 F.3d at 317–18 (same). The *Nastasi* court even acknowledged that the 2001 amendment was a significant departure from the prior section. *See* 2002 WL 1267995, at \*1 n.2. Both courts thus considered only what benefits were ***diverted*** from intended uses or recipients—not the value of the benefits that the unintended recipient ***obtained***. *See Brown*, 151 F.3d at 489; *Nastasi*, 2002 WL 1267995, at \*3.

More fundamentally, the wrongdoing in both of these cases had nothing to do with government contracts—*Brown* dealt with Section 8 housing vouchers, *Nastasi* with Medicare and Medicaid benefit payments—much less a contract to provide services back to the contracting agency. When the VA hired a builder, it could not have reasonably intended for the veteran-owned business to retain 100% of the contract's value: that business would have to incur substantial costs, such as the value of labor and materials, to perform on the contracts. An eligible veteran-owned business would not have "obtained" the value of these costs, and neither did White.

Through fraud, White was able to win contracts that the government intended to go to small businesses owned by men and women who served their country in the military. But the nature of White's crime cannot obscure the fact that he at least partially performed under the contracts he fraudulently received. He did not receive or intend to receive the face value of the contract as a "benefit"—the true loss caused by White's crime

8

was his actual or intended profit. The government declined to meet its burden to prove these losses. It may not now substitute the face value of the contracts for the true value of the benefits White obtained.

### III. CONCLUSION

For the reasons set forth above, this Court concludes that the value of the loss caused by White, for the purposes of section 2B1.1(b) of the Sentencing Guidelines, is the value of the actual or intended benefits obtained—in this case, his actual or intended profit—and not the face value of the set-aside contracts White fraudulently procured.

Dated:   New York, New York
         October 2, 2012

_____
Sidney H. Stein, U.S.D.J.